People v Lebron (2018 NY Slip Op 07368)





People v Lebron


2018 NY Slip Op 07368


Decided on November 1, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 1, 2018

108813

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
MYLIEK LEBRON, Appellant.

Calendar Date: September 6, 2018

Before: Garry, P.J., Egan Jr., Mulvey, Aarons and Pritzker, JJ.


Mitchell S. Kessler, Cohoes, for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.



MEMORANDUM AND ORDER
Garry, P.J.
Appeal from a judgment of the County Court of Schenectady County (Sypniewski, J.), rendered August 15, 2016, upon a verdict convicting defendant of the crimes of murder in the second degree and criminal possession of a weapon in the second degree (four counts).
In June 2015, Lasean Gause (hereinafter the victim) was killed when two assailants shot at a group of people standing outside a grocery store in the City of Schenectady, Schenectady County. Defendant, Kasheef James and Joshua Sayles were thereafter jointly charged with two counts of murder in the second degree (reckless and intentional) and four counts of criminal possession of a weapon in the second degree. Sayles agreed to provide truthful testimony as part of an agreement by which he pleaded guilty to criminal possession of a weapon in the second degree, and County Court severed James' trial from defendant's trial. Following a jury trial, defendant was convicted of intentional murder in the second degree and four counts of criminal possession of a weapon in the second degree. He was sentenced to an aggregate prison term of 25 years to life. Defendant appeals.
Initially, defendant claims that County Court violated the statutory requirement that jurors must be sworn in "immediately" after their selection when it delayed the swearing in of jurors until all members of the jury had been chosen (CPL 270.15 [2]). Defendant failed to preserve this claim with a timely objection, and thus the court did not have an opportunity to correct this error (see People v Ross, 34 AD3d 1124, 1125 [2006], lvs denied 8 NY3d 879, 884 [2007]). Contrary to defendant's claim, the delay was not a mode of proceedings error, such that preservation was not required. It was instead a "technical error" (People v Quinones, 18 AD3d 330, 331 [2005], lv denied 5 NY3d 809 [2005]) that did not "go[] to the essential validity of the proceedings conducted below such that the entire trial [was] irreparably tainted" (People v Agramonte, 87 NY2d 765, 770 [1996] [internal quotation marks and citation omitted]). Notably, all jurors were sworn immediately after the final group of jurors was selected, before opening [*2]statements were given and before any evidence was presented, and defendant has identified no prejudice resulting from the delay.
Defendant next contends that his conviction for murder in the second degree is against the weight of the evidence in that the People failed to prove that he or James intended to kill any specific individual when they fired their weapons toward the people outside the grocery store. The testimony of the People's witnesses established that defendant had been "jumped" in an attack by multiple younger individuals several days earlier. In a video recording made shortly after the attack, defendant vowed revenge and specifically mentioned a person called "J Savage." On the evening of the shooting, a group that included defendant, James, Sayles, Aaron Ketchmore and a female friend of defendant (hereinafter the friend) gathered on the street outside defendant's home. According to the friend, Ketchmore mocked defendant for having been attacked by younger boys and said that if he had been attacked, he would have done something about it and "shot at people."[FN1] Sayles testified that Ketchmore criticized defendant for failing to "handle [his] business" by responding to the attack, and told him that his inaction "ma[de the neighborhood] look bad." Ketchmore said something about going to get a gun. He and defendant briefly departed, rejoining the group after about five minutes.
Sayles then drove defendant and the friend around the area in Sayles' silver Chrysler, driving past a park and the store where the shooting later occurred. The friend said that defendant wanted "[t]o see if anyone was outside that he had problems with." Sayles testified that defendant wanted to know if anyone who had been involved in the attack — in particular J Savage — was in the park, but that it was too dark to see. When the vehicle returned "uptown," defendant asked Sayles for James' telephone number. According to the friend, defendant wanted to make calls "to find someone else that had a gun to ride with him because he didn't want to go [back to the park] alone." James then passed by in another vehicle, and defendant flagged him down and told him to get into the Chrysler. According to Sayles, defendant told James that he thought that J Savage and others might be in the park. Sayles drove defendant to his home, where defendant went inside briefly and returned wearing a hooded sweatshirt. The friend testified that either defendant or James then said something about going to James' house to get another gun [FN2]. Sayles drove to James' home, where James put on a hooded sweatshirt with distinctive markings. They drove past the park again, but saw only children there. James asked defendant how he could have thought that J Savage was in this group, and complained that defendant "had [him] all amped up for no reason."
Sayles then drove past the grocery store, where people were standing outside. According to the friend, defendant, who was a member of the Crips gang, saw two men who were known to be members of the Bloods gang, and said that they were "the guys that said [that] when they see [defendant] they're going to jump [him]." Sayles testified that defendant said that he recognized someone and asked Sayles to stop. At defendant's direction, Sayles parked the vehicle around the corner of a nearby street, and defendant and James exited, putting their hoods up. According to Sayles, defendant said that he "might have to shoot at that guy," meaning the person he had recognized. Defendant asked James if he was ready to go, and he and defendant walked toward the store.
About two minutes later, Sayles and the friend, who had remained in the car, heard gunshots coming from the direction of the store. James and defendant ran to the car and got in. As Sayles drove away, he said that he hoped that James and defendant had not fired the gunshots, and defendant responded that he "had to let off at somebody." Defendant said that "he [did]n't want it to be obvious," took down his hood and reclined his seat. As the group drove around the park and back past the store to see if there had been any police response, James and defendant [*3]repeatedly said that they did not know if they had hit anyone. According to Sayles, James said that he did not know what person defendant had meant for him to shoot at, and that he had just shot at whoever was at the store, "empt[ying] out his clip." Defendant responded that he had intended for James to target a man wearing a red hoody or a red hat.[FN3]
Sayles then drove the vehicle to the street outside defendant's house, where defendant told Ketchmore that he "just had to lit up [the store]" and that "he let it go on somebody at [the store], he [saw] somebody over there." The group then entered defendant's house, where, according to Sayles, defendant said that he had seen someone at the store who had been involved in another attack on him a year earlier, and that defendant had felt the need to shoot at him. Defendant said that he had shouted this individual's name, that the person had started running and that he and James had shot at him but knew that they had not hit him. James and defendant each removed a gun from their hoody pockets and put them on the table, and defendant told Ketchmore that he had fired several shots before his gun jammed. Later, defendant used his phone to search for news about the shooting and told the friend that he had learned that the victim had been killed. According to the friend, defendant seemed surprised and "mad," but not remorseful, and said that he had been trying to shoot the two men he had identified as Bloods.
The People submitted surveillance video and audio recordings that, among other things, showed Sayles' car passing by the grocery store in the moments just before the shooting, followed by James and defendant walking toward the store and then fleeing a few moments later. There were also recordings of bystanders running away and the sound of multiple gunshots. Although none of the recordings included images of defendant or James firing their weapons, a witness who was standing near the victim heard several "pops" and turned in that direction. As she heard about six additional shots, she saw a man wearing a distinctive hoody, like the one worn by James, with his arm extended and "flashes" coming out of the extended arm. A second person, who matched defendant's description, was behind the first man and ran away while "checking around to see if his friend was coming." Another witness said that he heard shots fired and saw two men running down the street and getting into a Chrysler, which then "drove off nonchalant."[FN4]
The testimony established that a bullet struck the victim in the chest, passed through his lung and exited through his back. Although bullets were found nearby, it was not possible to identify the projectile that had struck the victim, and the guns were not recovered. A forensic scientist employed by the State Police testified that she examined nine casings found at the scene and concluded, based upon their markings, that three had been fired from one weapon and six from another weapon, and that the markings were consistent with the types of guns that witnesses said defendant and James had used. The People submitted a video recording of defendant's statement to police in which, after initial denials, he admitted his presence at the shooting scene but claimed that he was armed only with a BB gun, as well as a letter written by defendant to the victim's family in which he said that he was writing to apologize, but added that he was not solely responsible as the victim should have been provided with better medical care.
Contrary to defendant's assertion, the fact that James was convicted of manslaughter in the second degree does not affect our analysis of defendant's culpability. The record does not reveal the nature of the evidence that was presented against James at his separate trial (compare People v Ramos, 20 AD2d 882, 882 [1964]). It is well established that "the intent to kill may be inferred from the surrounding circumstances and a defendant's actions" (People v Stanford, 130 AD3d 1306, 1308 [2015] [internal quotation marks and citation omitted], lv denied 26 NY3d 1043 [2015]). The People submitted extensive evidence that defendant intended to target a certain individual or individuals, including his multiple statements to that effect. Even if a different verdict would not have been unreasonable, upon now viewing the evidence in a neutral light and giving the appropriate deference to the jury's credibility assessments, we find that this [*4]verdict was not against the weight of the evidence (see People v Bleakley, 69 NY2d 490, 495 [1987]; People v King, 124 AD3d 1064, 1065 [2015], lv denied 25 NY3d 1073 [2015]; People v Miller, 118 AD3d 1127, 1128-1129 [2014], lv denied 24 NY3d 1086 [2014]).
Defendant next challenges County Court's Molineux ruling, contending that Sayles was improperly permitted to testify that he overheard a discussion between defendant and Ketchmore about "reupping" a supply of "dope." "Evidence of prior criminal conduct or bad acts is inadmissible to establish a defendant's criminal propensity or bad character, but may be admitted when it is relevant to some material issue pertaining to the charged crime and its probative value outweighs its potential for unfair prejudice" (People v McCommons, 143 AD3d 1150, 1153 [2016] [citations omitted], lvs denied 29 NY3d 999, 1001 [2017]). The People contend that the "reupping" remark was admissible because it provided necessary background information explaining defendant's relationship with Ketchmore and was an inextricable part of the conversation in which Ketchmore volunteered to obtain a gun (see e.g. People v Anderson, 149 AD3d 1407, 1412 [2017], lv denied 30 NY3d 947 [2017]; People v Wells, 141 AD3d 1013, 1019-1020 [2016], lvs denied 28 NY3d 1183, 1185, 1189 [2017]). However, the reference to "reupping" was so brief and telegraphic that it shed no real light on the relationship between defendant and Ketchmore. Moreover, the remark was apparently made after Ketchmore and defendant returned from obtaining the gun, and thus could have been omitted from Sayles' testimony without disturbing that narrative. Accordingly, the testimony should not have been admitted (see People v Crandall, 67 NY2d 111, 116-117 [1986]). Nevertheless, in light of the overwhelming nature of the other evidence, we find that there is no significant probability that defendant would have been acquitted if this brief testimony had not been admitted and, thus, the error was harmless (see People v Crimmins, 36 NY2d 230, 242-243 [1975]; People v Anderson, 149 AD3d at 1412).
Finally, we reject defendant's contention that his sentence is harsh and excessive. In view of the seriousness of defendant's crimes and his failure to accept responsibility for his actions, we find no abuse of discretion or extraordinary circumstances warranting a reduction in the interest of justice (see People v Sanchez, 75 AD3d 911, 914-915 [2010], lv denied 15 NY3d 895 [2010]; People v Clarke, 5 AD3d 807, 810 [2004], lvs denied 2 NY3d 796, 797 [2004]).
Egan Jr., Mulvey, Aarons and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: The friend testified for the People pursuant to an agreement by which she was not prosecuted for her involvement.

Footnote 2: Sayles gave differing testimony on this point, stating that James wanted to get his sweatshirt.

Footnote 3: It was not clear from Sayles' testimony whether defendant made all of these statements in the car, or whether some of them were made, or repeated, later in the evening.

Footnote 4: The other witnesses described the Chrysler as silver; this witness said that it was olive green.